UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GEORGE MUNTER,

     Plaintiff,

v.                        CASE No. 8:16-CV-2706-T-23TGW

NANCY A. BERRYHILL,
Acting Commissioner,
Social Security Administration,[1]

     Defendant.

_____

## REPORT AND RECOMMENDATION

The plaintiff in this case seeks judicial review of the denial of his claim for Social Security disability benefits.[2]  Because the decision of the Commissioner of Social Security is supported by substantial evidence and does not contain reversible error, I recommend that the decision be affirmed.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security and should therefore be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this action.  See 42 U.S.C. 405(g); Fed.R.Civ.P. 25(d).

[2] This matter comes before the undersigned pursuant to the Standing Order of this court dated January 5, 1998.  See also Local Rule 6.01(c)(21).

I.

The plaintiff, who was forty-seven years old at the time of the most recent administrative hearing and who completed the eighth grade, has worked as a jailer, service writer for RV repairs, an RV parts manager, and an RV transporter (Tr. 29, 50, 52, 53, 254, 255). He filed a claim for Social Security disability benefits, alleging that he became disabled on October 7, 2009, due to obesity, vertigo with balance issues, 50% carotid blockage, hyperlipidemia, fatty liver/non-alcoholic liver disease, soft tissue injury, constant pain, unable to write, no strength, weakness and pain in legs, wheezing, and numbness in his mouth, eyes and face (Tr. 101, 117, 253). The claim was denied initially and on reconsideration.

The plaintiff, at his request, then received a de novo hearing before an administrative law judge. At the first administrative hearing, the plaintiff amended his disability onset date to April 16, 2012 (Tr. 47). Thereafter, the law judge held a second administrative hearing in which a medical expert, Dr. Leonard M. Rubin, testified (Tr. 82-99). The law judge found that the plaintiff had severe impairments of "Sicca (Sjogren) syndrome; tremors, not otherwise specified; mild osteoarthritis, multiple joints; obesity;

depressive disorder, not otherwise specified; and anxiety, not otherwise

specified (20 CFR 404.1520(c))" (Tr. 17). She concluded that, with these

impairments (Tr. 22):

> the [plaintiff] had the residual functional capacity
> to perform light work as defined in 20 CFR
> 404.1567(a). The [plaintiff] can lift and carry 10
> pounds occasionally and smaller items frequently.
> The [plaintiff] can stand or walk six hours out of an
> eight hour workday and sit for six hours out of an
> eight hour workday. The [plaintiff] can
> occasionally climb and frequently stoop, kneel,
> crouch, or crawl. The [plaintiff] is limited to
> frequent handling and fingering with his bilateral
> upper extremities. The [plaintiff] must avoid
> concentrated exposure to pulmonary irritants,
> vibrations, and hazards such as heights and
> dangerous or moving machinery. The [plaintiff] is
> limited to simple, routine tasks involving only
> occasional contact with coworkers, supervisors,
> and the general public. The [plaintiff] is limited to
> work places that involve only little or gradual
> workplace changes.

The law judge found that, with these limitations, the plaintiff was unable to

perform any past relevant work (Tr. 29). However, based on the testimony

of a vocational expert, the law judge determined that the plaintiff could

perform other jobs that exist in significant numbers in the national economy,

such as a data checker, scale attendant, and medical supplies assembler (Tr. 30). Accordingly, she decided that the plaintiff was not disabled (Tr. 30).

The plaintiff sought review of the decision by the Appeals Council. In connection with the request for review, the plaintiff submitted additional evidence, including a medical assessment form completed by Dr. Jaishree Manohar dated May 13, 2016, and a Mental Residual Functional Capacity Assessment from June 28, 2016, completed by Dr. Melissa Fickey (Tr. 1-4, see Tr. 1202-1205, 1206-1209). The Appeals Council found that the additional information does not provide a basis for changing the law judge's decision (Tr. 2). Accordingly, it let the law judge's decision stand as the final decision of the Commissioner (Tr. 1).

## II.

In order to be entitled to Social Security disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. 423(d)(1)(A).   A "physical or mental impairment," under the terms of the Act, is one "that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. 423(d)(3).   In this case, the plaintiff must show that he became disabled before his insured status expired on December 31, 2014, in order to receive disability benefits.  42 U.S.C. 423(c)(1); Demandre v. Califano, 591 F.2d 1088, 1090 (5th Cir. 1979), cert. denied, 444 U.S. 952.

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence.  42 U.S.C. 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  Under the substantial evidence test, "findings of fact made by administrative agencies ... may be reversed ... only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035 (2005).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. <u>Grant</u> v. <u>Richardson</u>, 445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence. <u>Celebrezze</u> v. <u>O'Brient</u>, 323 F.2d 989, 990 (5th Cir. 1963).

Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to reweigh the evidence, but is limited to determining whether the record as a whole contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled. However, the court, in its review, must satisfy itself that the proper legal standards were applied and legal requirements were met. <u>Lamb</u> v. <u>Bowen</u>, 847 F.2d 698, 701 (11th Cir. 1988).

III.

The plaintiff challenges the Commissioner's decision on six grounds. The plaintiff argues: (1) The law judge failed to rule on objections regarding the testimony of a medical expert at the second administrative hearing; (2) erred in giving great weight to the expert's testimony; (3) failed to give weight to a doctor's opinion regarding the plaintiff's ability to understand task instructions; (4) did not give the plaintiff's treating physicians' opinions proper weight; (5) erred in not recognizing that the plaintiff's tremors were verified by a nerve conduction study; and (6) new evidence submitted to the Appeals Council demonstrates that the law judge's decision was wrong. None of the arguments is meritorious.

A.     In the plaintiff's first argument, he asserts that the law judge "failed to rule on the objections of the testimony of Dr. Rubin in accordance with Hallex I-2-5-30(B)" and "failed to respond to objections in her decision or in a separate document" (Doc. 24, pp. 11-12). The plaintiff's argument is unavailing.

At the second administrative hearing conducted on March 2, 2015, Dr. Leonard M. Rubin ("Dr. Rubin"), a retired general internist,

provided expert testimony regarding the plaintiff's impairments based on his review of the medical record (Tr. 85-94).[3]    The plaintiff premises his argument upon a provision of HALLEX, a Social Security Administrations Hearings, Appeals and Litigation Law Manual, that relates to hearing testimony (Doc. 24, pp. 11-12, citing HALLEX I-2-5-30(B)).   However, HALLEX is an internal manual that provides policy and procedural guidelines; it was not promulgated in accordance with the procedural requirements for the creation of binding regulations and, therefore, has no legal force. Moore v. Apfel, 216 F.3d 864, 868-69 (9th Cir. 2000); Schweiker v. Hansen,  450 U.S. 785, 789 (1981) ("[T]he Claims Manual is not a regulation. It has no legal force, and it does not bind the SSA."). This is fatal to the plaintiff's argument.

Even if HALLEX were binding, the Commissioner persuasively counters that the law judge followed the directives of HALLEX by asking

---

[3]A different doctor, Dr. Charles Plotz, completed a form, "Medical Interrogatory Physical Impairment(s)- Adults" on October 31, 2014, but he did not appear at the hearing to testify because he was unable to do so (see Tr. 84, 1172-74).  Dr. Rubin instead testified (Tr. 85-94).

plaintiff's counsel[4] at the hearing if he had any objection to the expert's testimony, but counsel waived the right to assert any objections to Dr. Rubin's testimony (Doc. 26, pp. 6-7). Thus, HALLEX I-2-5-30(B) provides:

> The claimant may state objections to the expert appearing by VTC or telephone, or he or she may object to the expert based on perceived bias or lack of expertise.   The ALJ will respond to any objections, either in writing or on the record at the hearing.

In accordance with HALLEX I-2-5-30(B), the law judge asked plaintiff's counsel, "[D]o you have any objection to Dr. Rubin serving as a medical expert in this case?" (Tr. 86).  Plaintiff's counsel responded "No, ma'am" (id.).  Further, there were no objections for the law judge to address because the plaintiff did not raise any objections to the questions asked of Dr. Rubin at the hearing.  Therefore, any objection to Dr. Rubin's testimony was waived by counsel.  Notably, plaintiff's counsel was given an opportunity to cross-examine Dr. Rubin and in fact did so (see Tr. 87-93).

---

[4]At the hearing, the plaintiff was represented by counsel.  Here, the plaintiff is proceeding pro se, since his attorney withdrew because he had been appointed a federal administrative law judge, and the plaintiff did not replace him.

The plaintiff attempts to get some mileage out of his previous counsel's post-hearing written objections (see Doc. 24, p. 11; Tr. 39-42). The Commissioner explains that HALLEX I-2-5-30(B) does not refer to objections after a hearing, but only relates to objections raised during the hearing (Doc. 26, p. 6). HALLEX I-2-5-30(B) provides that "[t]he ALJ will respond to any objections, either in writing or on the record at the hearing." Therefore, the provision does not address post-hearing objections.

Moreover, the Commissioner points out that HALLEX I-2-5-30(B) provides that an objection is to be based on the mode of testifying, or on bias or a lack of expertise (Doc. 26, p. 6). However, the plaintiff's objections are premised on the substance of Dr. Rubin's answers. The HALLEX provision does not contemplate objections to the substance of an expert's evidence; that matter is properly addressed in arguments to the law judge, the Appeals Council or this court.

B.     In the plaintiff's second argument, he asserts that the law judge "improperly gave great weight to the opinion of Dr. Rubin, medical expert despite Dr. Rubin testifying [that] the plaintiff is not disabled, failing to address the adequacy of the record and failing to properly examine the

-10-

entire record" (Doc. 24, p. 12). None of the plaintiff's arguments regarding the testimony of Dr. Rubin is meritorious.

Citing to HALLEX rules I-2-6-70(C) and I-2-5-39,[5] the plaintiff argues that Dr. Rubin improperly testified that the plaintiff's impairments are not severe enough to rise to the level of a disability (Doc. 24, pp. 12-13). Therefore, the plaintiff contends that the law judge erred in relying on Dr. Rubin's improper testimony.

The plaintiff's argument is premised on Dr. Rubin's hearing testimony in which he said that the plaintiff's impairments are not disabling. At the hearing, in response to the law judge's questioning, Dr. Rubin testified (Tr. 86-87):

> [The plaintiff] has several medical impairments. They do not rise to the level of the listing for disability under the Social Security rules but they, nevertheless, are serious.... So he does have many

---

[5]HALLEX Rule I-2-5-39 rule provides:

> When an administrative law judge (ALJ) obtains a medical expert (ME) opinion during a hearing, the ALJ will generally explain why the ME is present before his or her opening statement....

diagnoses which impair his ability to work but not to the extent that he's completely disabled.

In this respect, HALLEX rule I-2-6-70(C) states:

> The ALJ will not permit the ME to respond to questions on nonmedical matters or to draw conclusions not within the ME's expertise. For example, the ME may not provide opinions regarding vocational factors or the resolution of ultimate issues of fact or law. However, the ME may respond to questions about the effects of the claimant's medical treatment on the claimant's ability to engage in work related activities.

> ...

> Note (HALLEX rule I-2-6-70(D)):

> An ALJ may not ask an ME to decide whether the claimant is disabled.

The plaintiff's reliance on HALLEX is misplaced. As previously explained, HALLEX is an internal manual that provides policy and procedural guidelines. Therefore, it has no legal force. Moore v. Apfel, supra, 216 F.3d at 868-69; Schweiker v. Hansen, supra, 450 U.S. at 789.

In addition, the plaintiff's attorney did not assert a contemporaneous objection to the phrase in the answer that was later

-12-

considered improper. In this circumstance, the objection is waived. See Rule

103(a)(1)(A), F.R.E.

Moreover, the Commissioner aptly responds that the law judge

did not rely on or mention Dr. Rubin's comment that the plaintiff's

impairments were not completely disabling (Doc. 26, p. 8; Tr. 27-28). Rather,

the law judge analyzed Dr. Rubin's testimony in relation to the other medical

evidence in the record in determining the plaintiff's residual functional

capacity (Tr. 27-28). In this respect, the law judge stated (id.):

> Opinion evidence further supports the residual
> functional capacity. The undersigned affords great
> weight to the testimony of the medical expert, Dr.
> Rubin. Dr. Rubin is a qualified medical doctor, and
> the [plaintiff's] attorney submitted multiple
> questions to him. Dr. Rubin thoroughly reviewed
> the medical evidence and provided specific cites to
> evidence. Dr. Rubin testified that the [plaintiff]
> would have some difficulty with standing and
> walking and no problem sitting. He also testified
> that the [plaintiff] would have some difficulty
> using his hands, but it was unclear how much. Dr.
> Rubin rejected the [plaintiff's] attorney's allegation
> that the [plaintiff's] alleged dizziness would
> influence his ability to perform work related tasks.
> Dr. Rubin pointed out that, although medical
> records note that the [plaintiff] reported dizziness,
> no diagnosis was made pertaining to it. Further, he
> noted that the [plaintiff's] brain MRI was normal

> and that there were no findings regarding dizziness
> on physical examination. The undersigned affords
> little weight to Dr. Rubin's testimony regarding the
> [plaintiff's] shoulders because Dr. Shingala found
> that the [plaintiff] had no restricted range of motion
> in his shoulders. Additionally, Dr. Joshi did not
> note any restricted range of motion in either of the
> [plaintiff's] shoulders. As previously noted,
> several examiner[s] found full upper body strength.

Thus, there is no indication that the law judge gave any weight to Dr. Rubin's

comment that the plaintiff's diagnoses do not render him completely disabled.

Rather, the law judge thoroughly reviewed the entire medical record and

various doctors' opinions in determining the plaintiff's residual functional

capacity.

The plaintiff argues further that the law judge erred in relying on

Dr. Rubin's testimony based on other objections that his prior counsel raised

to the law judge regarding Dr. Rubin's testimony. At the hearing, plaintiff's

counsel asked Dr. Rubin if there was other evidence that the doctor would

need in forming his opinion regarding the plaintiff's limitations (Tr. 88). Dr.

Rubin answered (id.):

> Well, the last exhibit that I have is dated December
> of 2014. That's pretty recent and I don't think - -
> I mean it's possible that there's been change

> between then and now but it's only two months
> later. I think it's unlikely that any, unless some
> new dramatic symptom occurred between then and
> now, it's hard for me to imagine what more
> information would be necessary to adjudicate this
> case.

There does not appear anything wrong with the doctor's answer to counsel's

question. There certainly is nothing in that answer that would compel the law

judge to reject Dr. Rubin's testimony.

The plaintiff further argues that the law judge should not have

relied on Dr. Rubin's testimony because "he had no knowledge regarding a

specific objective clinical test which was administered" and "he did not know

what was meant by another clinician indicating [that he had a] 'moderate

deficit of sitting'" (Doc. 24, p. 13). The plaintiff also asserts that Dr. Rubin

was not aware of exhibit 44F of the medical record until plaintiff's counsel

inquired about it.

The plaintiff's argument concerns his former counsel's

questioning of Dr. Rubin regarding medical records contained in exhibit 44F

from the Watson Clinic (see Tr. 1159-1171). The treatment notes are from

the clinic from October 2014, in which the plaintiff sought treatment for his

complaints of dizziness and vertigo (see e.g., Tr. 1159).  According to the treatment notes, a test titled "Modified Clinical Test for Sensory Interaction on Balance" was performed on October 1, 2014, with unclear results (see Tr. 1160).  On that same date, the plaintiff's gait was noted as "[p]eriodic sway, slow, looks down, decreased head movement, decreased push off secondary to toe pain, [and] decreased step length" (Tr. 1160).  Under posture section of the musculoskeletal portion of the notes, without further explanation, it stated, "[s]itting, moderate deficits: [r]ounded shoulders, forward" (id.).

At the hearing, plaintiff's counsel asked Dr. Rubin if he saw anything in the record regarding the plaintiff's complaints of dizziness and imbalance issues (Tr. 88-89).  Dr. Rubin responded that he "didn't make note of it on my notes so I don't think it was dramatic, but I, I might have missed it" (Tr. 89).  Dr. Rubin further clarified "I see a note in Exhibit 4E that the patient reports dizziness and some loss of balance so I neglected to reference that in my previous comments" (id.).

The plaintiff argues that the law judges's decision was not based on substantial evidence because she accepted Dr. Rubin's inaccurate testimony.  The plaintiff complains that the doctor's testimony was not fully

accurate because counsel had to direct the doctor's attention to exhibit 44F
(see Tr. 1159-1171). The plaintiff also argues that Dr. Rubin's testimony
neglected to include his limitations of "swaying, slowing[,] or looking down"
(Doc. 24, p. 13).

If Dr. Rubin overlooked the evidence in his original answer
regarding the plaintiff's complaints of dizziness, it was corrected at the
hearing once he reviewed the exhibit and provided testimony on the matter.
Dr. Rubin explained exhibit 44 as follows (Tr. 89-90):

> All right. At page 1 there's not working.
> Treatment, here, medical diagnosis, dizziness and
> vertigo. Right. Let's see what was found on the
> physical exam. Neuromuscular coordination
> normal. Muscle tone normal. No increase in
> symptoms or a nystagmus. Yeah, there are
> references to [dizziness] but not much on a
> physical examination. Let's see. Referral,
> neurology and the impression was vertigo. This
> demonstrated significant central vestibular
> function, no peripheral vestibular function. States
> he gets dizzy upon standing especially with getting
> out of bed. Well, no diagnosis was made really to
> the, addressing those symptoms. It was not either
> classified as benign paroxysmal positional vertigo
> or PPPV, nor was it - - on page 11, the patient
> presents with a prior history of imbalance. He's
> had hearing evaluation performed. He has lost
> high frequency in the left. He had a MRI performed

> which does not reveal any evidence of
> cerebellopontine angle lesion. So I recommend we
> continue to monitoring [sic] the hearing with
> regard to the hearing evaluation. He will maintain
> a neurology evaluation for now, et cetera, et cetera.
> So basically no specific reason for the vertigo or
> the lightheadedness was found, and the MRI of the
> brain was normal, which was dated October 28,
> 2014.

Based on this response, Dr. Rubin fully reviewed exhibit 44 and explained his

basis for discounting the plaintiff's limitations regarding any sort of vertigo

issue. Accordingly, Dr. Rubin's answer, as amplified, was not insufficient.

Dr. Rubin's answers regarding dizziness and exhibit 44 do not

provide any basis for rejecting the law judge's assessment of Dr. Rubin's

testimony. The objections to Dr. Rubin's testimony were asserted by the

plaintiff's lawyer in an effort to get the law judge to reject Dr. Rubin's

testimony. That effort failed since the law judge for the most part gave great

weight to that evidence. The iteration of the attorney's objections by the

plaintiff (improperly through his wife)[6] to this court do not authorize the court

to reject evidence that the law judge accepted.

---

[6]Originally, the plaintiff's wife signed the plaintiff's Memorandum in Opposition
to the Commissioner's decision (see Doc. 24, p. 20). The plaintiff was directed to refile the
same memorandum with his signature (Doc. 27), and he in fact did so (see Doc. 28).

Moreover, the law judge discredited the plaintiff's complaints regarding vertigo and provided the following thorough credibility determination (Tr. 26):

> In addition to the medical findings, other factors suggest that the [plaintiff's] allegations may not be entirely credible. There are discrepancies in the [plaintiff's] reports. For example, the [plaintiff] reported to Dr. Shingala that he feels 'dizzy all the time.' At [the] hearing, the [plaintiff] reported that he is dizzy for the first thirty minutes after he wakes up. Further, in his examination with Dr. Carrera, he reported that he can drive, but 'slowly and with pain experienced.' This activity seems to contradict his allegation of constant dizziness. The [plaintiff] reported to Dr. Carrera that 'he can't hold nothing.' ... The [plaintiff] alleged in his function report that he frequently falls, but the undersigned can find little medical evidence to support that allegation. The undersigned can only find documentation of one fall requiring medical attention and this was prior to the amended alleged onset date. The undersigned also noted that the [plaintiff] reported that his pain medications made him very drowsy and caused him to sleep for several hours. However, the undersigned cannot find that the [plaintiff] persistently reported such a claim to his treating physicians. Thus, the number of significant inconsistencies in conjunction with the lack of objective evidence suggests that the [plaintiff's] allegations are not entirely credible.

Thus, the law judge provided ample justification for discounting the plaintiff's complaints of vertigo and, therefore, her decision was based on substantial evidence. Significantly, the plaintiff did not challenge the law judge's credibility determination. In light of the Scheduling Order and Memorandum Requirements, any such challenge is forfeited (Doc. 23, p. 2).

The plaintiff also attempts to discredit Dr. Rubin's testimony by asserting the law judge erred in accepting his testimony when the doctor did not know of a test titled "Modified Clinical Test for Sensory Interaction on Balance" performed at the Watson Clinic (Doc. 24, p. 13). At the Watson Clinic, on October 1, 2014, this test was conducted and it appears under the "Objective" portion of the treatment notes (Tr. 1160). The test appears to relate to testing the plaintiff's balance. However, no explanation is provided regarding the test's results (see id.). On the same page, under the "Functional Evaluation" portion, it states the plaintiff's gait as: "[d]eviations: Periodic sway, slow, looks down, decreased head movement, decreased push off secondary to toe pain, decreased step length" (id.). The plaintiff, therefore, argues that Dr. Rubin's testimony was incomplete because he did not

understand the test and did not include in his testimony plaintiff's gait of

"sway, slow, looks down" (Doc. 24, p. 13; Tr. 1160).

However, despite not being familiar with the test, Dr. Rubin

explained the test as follows (Tr. 91):

> But the whole type procedure was negative, which
> is a postural test where the patient lies down and
> you move the head from side to side and in patients
> with benign paroxysmal positional vertigo it
> replicates the symptomatology and so you can
> guide your treatment based on that. So some effort
> was made to try and name the reason for his, or
> give a diagnosis for the reason of the imbalance,
> but I don't believe it was ever completely arrived
> at and I'm sorry I don't know what the TPSID
> really would have shown.

Dr. Rubin went on to explain (Tr. 92):

> So decreased head movement, decreased push off
> secondary to no pain, decreased step length, those
> were all findings of the examining doctor, but it
> didn't advance the question. To my mind, it didn't
> advance the question of what is the diagnosis.

Therefore, contrary to the plaintiff's argument, Dr. Rubin explained the test

based on the minimal information provided in the treatment notes regarding

the test. In all events, as previously stated, while this might have been some

arguable ground to induce the law judge to reject Dr. Rubin's evidence, it

provides no basis for this court to reject the law judge's acceptance of Dr. Rubin's evidence.

The plaintiff also argues that Dr. Rubin did not understand the term "sitting, moderate deficits" under the musculoskeletal section of the treatment notes from the same date as the test (Doc. 24, p. 13; Tr. 1160). This argument is baseless.

These terms appear under the posture section of the musculoskeletal section. It only states without further explanation "Posture: Sitting, moderate deficits: Rounded shoulders, forward" (Tr. 1160). At the hearing, Dr. Rubin testified "I'm not sure what that means, a moderate deficit of sitting. Rounded shoulders forwarded. It's all sort of shorthand but it's not very illuminated" (Tr. 92).

The treatment notes do not provide further explanation about what moderate deficit in sitting means and the plaintiff has not provided any explanation either. Therefore, the plaintiff has not demonstrated that he requires additional sitting limitations for his residual functional capacity. Accordingly, the plaintiff's argument is without merit.

In sum, the plaintiff's arguments have not shown that the law judge erred in mostly accepting Dr. Rubin's testimony. Further, he has not demonstrated any legal basis for rejecting the law judge's finding on that matter.

C.     In the plaintiff's third argument, he asserts that "[t]he ALJ failed to weigh the opinions of Dr. Dotson, Ph.D. that the plaintiff has difficulty understanding task instructions and needed several explanations of how to complete the task. Substantial evidence from the 22 administered tests supports a determination the claimant is unable to perform competitive employment" (Doc. 24, p. 15). The Commissioner forcefully counters that the law judge correctly recognized that the test's results may have been invalid (Doc. 26, p. 10).

On February 6, 2014, psychologist Dr. Vonetta Dotson ("Dr. Dotson"), along with a graduate practicum student, administered various tests including the Wechsler Test of Adult Reading, Wechsler Abbreviated Scale of Intelligence, and the Wechsler Memory Scale-III (WMS-III) Logical Memory & Visual Reproduction (Tr. 959-968). Dr. Dotson, along with the graduate student, completed a Confidential Neuropsychological Evaluation

-23-

Report (id.). According to some of the test results, the plaintiff's "premorbid intellectual abilities are estimated to have been [in] low average range (WTAR = 84; 14th%tile)," his performance was "within the impaired range for overall intellectual functioning (WASI IQ = 67, 1st%tile)," and he had "low verbal skills (Verbal IQ = 66, 1st%tile)" (Tr. 961).

The plaintiff argues that these test results demonstrate that he has cognitive impairments and, therefore, he is unable to work (Doc. 24, pp. 15-16). The plaintiff's argument is without merit.

The plaintiff argues that the law judge should have accepted the test results, but neglects to mention that Dr. Dotson repeatedly mentioned in the report that the low test scores may be invalid. Dr. Dotson explained (Tr. 961):

> His performance on empirically derived measures of symptom validity suggested that he may not have put forth consistent effort during the evaluation. As such, the following test results are potentially an underestimation of [the plaintiff's] current cognitive functioning.

Dr. Dotson also stated the plaintiff's (id.)

> performance on a measure of effort (TOMM Trial 1 = 33, Trial 2 = 30, Trial 3 = 37) suggests that he

might not have consistently exerted full effort
during testing.  Test results should be interpreted
within this context.

Dr. Dotson further explained (Tr. 963):

In the context of [the plaintiff's] performance on
measures of effort and validity, which suggest that
he may not have exerted full effort during the
evaluation, he may be capable of better cognitive
functioning than these test results indicate. ... [The
plaintiff's] MMPI-2 profile was invalid based on
his pattern of responding inconsistently to similar
items, endorsing a high number of extreme and
unusual symptoms, and over-representing moral
virtues.  His report of extreme symptoms on this
questionnaire parallels his report during the
interview of rather extreme difficulty with daily
living skills (e.g., not remembering to boil water to
make pasta; getting so disoriented while driving
that he has to call his wife to ask where he is).

Dr. Dotson's interpretation of the test results was as follows (Tr. 963-964):

[The   plaintiff's]   generally   impaired
neuropsychological profile is consistent with his
report of cognitive decline and difficulties in ADLs
and IADLs.  However, it is not consistent with
other aspects of his history or the current
evaluation. For example, an MRI performed on the
day of the evaluation was only significant for signs
of probable silent sinus syndrome and did not show
brain changes (e.g., decreased volume, white
matter changes) that would be expected for
someone with long-standing cognitive difficulties

-25-

of such severity. Moreover, he presented as coherent, oriented, and alert, with fluent speech and intact comprehension, which would not be expected in someone with the severity of impairments that he reported or with his cognitive profile. Additionally, [the plaintiff] showed several inconsistencies throughout the evaluation, including variable responding on questionnaires, and hand tremor that varied during the testing day and even within items on the same drawing, which further complicate diagnosing. **Overall, results are not in line with any known neurological condition**. His difficulties are also unexplained by his current medications or any acute medical illness. He may be experiencing difficulty with memory and other cognitive functions in everyday life, but the extent of his difficulties is not clear based on the current evaluation.

The law judge, in her decision, frequently noted Dr. Dotson's statements concerning the tests' scores validity (see Tr. 18, 21, 25-26, 27). Certainly, the law judge was not required to accept test results that may not be valid. Therefore, the law judge did not have to incorporate in her finding of the plaintiff's residual functional capacity opinions that she had discounted. Cf. Davis-O'Brien v. Astrue, 415 Fed. Appx. 137, 140 (11th Cir. 2011).

Other record evidence indicates that the plaintiff purposefully underperformed on cognitive tests (see Tr. 767 ("cognitive function would

appear to be relatively normal although there seems to be some possible reluctance to perform cognitively in a fluctuating fashion during today's interview"); Tr. 772 ("His Mindstreams Advanced Cognitive Assessment test today shows extremely poor performance.... This does not match his general mentation .... indicate the likelihood of either severe distraction or functional performance or lack of"); Tr. 774 ("It is strongly suspect that the very low performance in all cognitive tests was of a functional nature underperforming)).

The law judge, in her decision, also noted that the medical record demonstrated that the plaintiff had mostly "normal mental health findings" (Tr. 26). For example, the plaintiff often was noted to be alert and oriented or have normal cognitive functioning (See Tr. 521, "[t]hought content/perception - [n]ormal. Cognitive function - appropriate fund of knowledge, aware of current events and recalls past history. No impairment of attention or Impairment of global orientation"); Tr. 550 (psychiatric exam was "[n]ormal judgment and insight. Patient is oriented to person, place, and time. Mood is normal"); Tr. 600 (under physical exam, was "alert and oriented times three"); Tr. 608 ("[o]riented to time, place, and person"); Tr.

649 ("oriented to time, place, person, and situation.... demonstrates the appropriate mood and affect"); Tr. 667 ("[n]egative for difficulty concentrating")). Accordingly, the law judge's decision with respect to the plaintiff's mental capabilities is supported by substantial evidence.

The plaintiff also in his heading purports to argue that the law judge erred in not stating the weight afforded to Dr. Dotson's opinion (see Doc. 24, p. 15). However, in light of the Scheduling Order and Memorandum Requirements, any argument based on the law judge not assigning weight to Dr. Dotson's opinion is forfeited for failing to develop the argument (see Doc. 23, p. 2). Sanchez v. Commissioner of Social Security, 507 Fed. Appx. 855, 859 n.1 (11th Cir. 2013), quoting Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("A legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

Moreover, the law judge's failure to assign weight to Dr. Dotson's report would be harmless error because it would not change the law judge's findings with respect to the plaintiff's mental limitations. Denomme v. Commissioner of Social Security, 518 Fed. Appx. 875, 877 (11th Cir. 2013)

(citing Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir.1983)) (An error is harmless when the correction of an error would not change the law judge's ultimate finding); see also Sanchez v. Commissioner of Social Security, supra, 507 Fed. Appx. at 856.

In sum, the law judge provided ample justification for rejecting invalid test results with respect to the plaintiff's cognitive abilities.

E.     In the plaintiff's fourth argument, he asserts that "substantial evidence regarding Sjogren's syndrome is contrary to the opinion of Dr. Plotz, consultative Dr. [sic] and Dr. Rubin.   Plaintiff's treating physicians not given proper weight" (Doc. 24, pp. 16-17).   The plaintiff's arguments are without merit.

Opinions from treating physicians are entitled to substantial or considerable weight unless there is good cause for not affording them such weight.  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004).   Good cause exists when the treating physician's opinion is not bolstered by the evidence, the evidence supports a contrary finding, or when the opinion is conclusory or inconsistent with the physician's own medical records.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

The plaintiff argues that the law judge did not give proper weight to the opinion of his treating physician, Dr. Vipul Joshi, regarding his symptoms from Sjogren's syndrome (Doc. 24, pp. 16-17). In support of his argument, the plaintiff briefly lists various symptoms that Dr. Joshi reported. For example, on November 18, 2013, Dr. Vipul Joshi indicated in his treatment notes that "[t]he working diagnosis is Sjogren syndrome" (Tr. 808, see also, Tr. 816). Dr. Joshi noted that clinical findings included "dry eyes, dry mouth, positive ANA, positive SSB antibody, morning stiffness lasting for at least 1 hour ..." (Tr. 808). Later on March 4, 2013, Dr. Joshi again indicated that "[t]he working diagnosis is Sjogren syndrome" (Tr. 816). The doctor advised the plaintiff to "stay up to date with eye and dental appointments" (id.). Dr. Joshi at one point noted that the plaintiff had "[g]eneralized tenderness in the thoracic/rib area, generalized tenderness in the lumbar area, [and] tenderness of the right SI joint" (Doc. 24, p. 16; Tr. 821). The plaintiff, therefore, apparently is arguing that the law judge should have found him disabled based on Dr. Joshi's findings.

However, the plaintiff's argument is baseless because the law judge considered Dr. Joshi's opinion and concluded that the plaintiff's

Sjogren's syndrome is a severe impairment. Consequently, the law judge limited the plaintiff to a restricted range of light work to accommodate that severe impairment.

The Commissioner responds that the plaintiff does not explain how the evidence compels greater physical limitations due to Sjogren's syndrome (see Doc. 26, p. 12). A plaintiff must show that his impairment caused additional work limitations. Thus, "a diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on h[is] ability to work." Wind v. Barnhart, 133 Fed. Appx. 684, 690 (11th Cir. 2005), quoting McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). In other words, it is the functional limitations that determine disability. Moore v. Barnhart, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005); McCruter v. Bowen, supra. Significantly, the plaintiff has not pointed to any medical evidence from the pertinent time period that states he has greater physical limitations than those imposed by the administrative law judge. See Longworth v. Commissioner of the Social Security Admin., 402 F.3d 591,

596 (6th Cir. 2005) (a lack of physical restrictions constitutes substantial evidence for a finding of non-disability).

As explained, the law judge determined that the plaintiff has severe impairments of Sjogren syndrome and mild osteoarthritis (Tr. 17). In determining the plaintiff's residual functional capacity, the law judge limited the plaintiff to a reduced range of light work (Tr. 22). The law judge provided various limitations in the residual functional capacity, including the limitation of "frequent handling and fingering with his bilateral upper extremities", "lift[ing] and carry[ing] 10 pounds occasionally and smaller items frequently" and the "avoid[ance] [of] concentrated exposure to pulmonary irritants, vibrations and hazards such as heights and dangerous or moving machinery" (id.). The plaintiff has not shown he requires additional limitations due to his Sjogren's syndrome.

In this respect, the law judge considered Dr. Joshi's opinion and the medical record, thereby determining that the plaintiff's Sjogren syndrome is a severe impairment. Moreover, the law judge in explaining the syndrome, stated (Tr. 17):

-32-

> Dr. Joshi formed a 'working diagnosis' of Sicca (Sjogren) syndrome based on the [plaintiff's] 'dry eyes, dry mouth, positive ANA, positive SSB antibody, morning stiffness lasting for at least one hour, simultaneous involvement of three or more joints, synovitis of MCP joints, wrist arthritis, and synovitis of PIP joints.'

The law judge continued (Tr. 17):

> Dr. Wright also concluded that the [plaintiff] suffers from Sjogren Syndrome (Exh. 16F). Dr. Plotz answered interrogatories and indicated that the [plaintiff] 'claims Sjogren's syndrome (rare in men) but there is no evidence of associated disease.' (Exh. 43F). Dr. Plotz also reported that there was no evidence of disabling rheumatologic or connective tissue disease.

The law judge further stated (Tr. 20):

> The undersigned also considered listing 14.10, Sjogren's syndrome. In response to medical interrogatories, Dr. Plotz points out that there is no evidence of associated disease, specifically no rheumatic or connective tissue disease. (Exh. 45F). Additionally, no examining or treating source suggests that the [plaintiff's] Sjogren's syndrome involves two or more body systems to at least a moderate level.

The plaintiff's conclusory argument regarding the symptoms of

Sjogren's syndrome does not demonstrate that the law judge's treatment of

Dr. Joshi's opinions was in error.  Indeed, the law judge accepted the doctor's opinion concerning Sjogren's syndrome and formulated the residual functional capacity to accommodate the syndrome.  As stated, a diagnosis is not enough; it is the functional limitations that determine disability.  Wind v. Barnhart, supra;  Moore v. Barnhart, supra; McCruter v. Bowen, supra.  Notably, the plaintiff does not cite to evidence from Dr. Joshi demonstrating that he had greater limitations other than those imposed by the law judge.

The plaintiff in support of his argument cites to Dr. Joshi's treatment notes that he had decreased grip strength (Tr. Doc. 24, p. 16).  On February 12, 2013, Dr. Joshi under the neurologic section wrote "[m]otor function normal. Right hand grip reduced, left hand grip reduced" (Tr. 820).  Later, on April 10, 2013, Dr. Joshi again wrote the same note "[m]otor function normal. Right hand grip reduced, left hand grip reduced" (Tr. 836).  The plaintiff's argument is without merit.  Thus, it is not enough to cite to some evidence to support a disability, the evidence must compel a contrary conclusion.  Adefemi v. Ashcroft, supra.  The plaintiff's conclusory argument does not demonstrate that the law judge's decision was not based on substantial evidence.

-34-

The law judge provided ample reasons for not fully accepting the plaintiff's diminished grip strength.  The law judge explained (Tr. 20):

> ...although there is some evidence that the [plaintiff] has decreased grip strength, it is not entirely clear how much it is decreased.

In this respect, the plaintiff's reference to Dr. Joshi's treatment notes do not indicate the extent of the plaintiff's diminished grip strength (Tr. 820).

The law judge continued (Tr. 20):

> Dr. Shingala, the consultative examiner, was unable to check the [plaintiff's] hand strength due to the [plaintiff's] lack of cooperation. (Exh. 6F). The psychological consultative examiner noted that the [plaintiff] could bathe, shower, dress himself, groom himself, use the toilet unassisted, and use the telephone.  The totality of these activities suggests that the [plaintiff] can perform gross and fine movements effectively.

The law judge also cited to objective medical evidence concerning the plaintiff's grip strength that did not demonstrate gross abnormal findings. The law judge explained (Tr. 23; see also Tr. 833, 834):

> X-rays also revealed osteoarthritic changes in both the [plaintiff's] hands and feet.  However, generally imaging studies revealed no more than mild findings.

-35-

The law judge added (Tr. 24):

> The [plaintiff] alleged severe weakness, especially
> in his arms and hands. The [plaintiff] did complain
> of hand weakness to examiners. In November
> 2012, an examiner indicated that the [plaintiff's]
> grip was present but 'slightly' weak. (Exh. 13F).
> Records dated January 2013, indicate that the
> [plaintiff] suffered from bilateral hand weakness,
> but there is no degree of weakness provided. It is
> unclear whether this is based on the [plaintiff's]
> own report or testing. In November 2013, Dr.
> Joshi, a rheumatologist, noted that the [plaintiff]
> exhibited reduced right and left hand grip. (Exh.
> 15F). Despite these notations, the degree of the
> [plaintiff's] decreased grip strength is again
> undocumented. The plaintiff did not allow the
> consultative examiner, Dr. Shingala, to test his grip
> strength. Dr. Joshi's records consistently indicate
> that the [plaintiff] suffered from tenderness in his
> elbows, wrists, and fingers. (Exh. 15F). However,
> the [plaintiff] still maintained normal range of
> motion. In April 2013, Dr. McElveen noted that
> the [plaintiff] had full upper extremity strength.
> (Exh. 9F). In October 2013, Dr. Ritter and noted
> that the [plaintiff] had full upper body strength.
> (Exh. 12F). Dr. Shingala also found full upper
> body strength.

Notably, Dr. W. Alvin McElveen, on physical examination on April 16, 2013,
found that the plaintiff had a "5/5 normal muscle strength - left upper
extremity, left lower extremity, right upper extremity and right lower

extremity" (Tr. 521). On October 7, 2013, Dr. Yoav Ritter, found that the

plaintiff's "[m]otor exam is 5/5 in upper extremities" (Tr. 598).

The law judge also addressed the plaintiff's carpal tunnel

syndrome as follows (Tr. 19):

> The [plaintiff] has a long history of carpal tunnel
> syndrome. The [plaintiff] has undergone multiple
> surgeries for carpal tunnel release. After these
> surgeries, the [plaintiff] appeared to do well. In
> November 2011, a nerve conduction/EMG revealed
> 'no evidence of carpal tunnel syndrome, peripheral
> neuropathy, ulnar neuropathy, radiculopathy, or
> plexopathy affecting either upper extremity or
> hand.' (Exh. 7F). Likewise, a nerve conduction
> velocity/EMG study dated October 2012 was
> within normal limits. (Exh. 13F). Treatment
> records dated January 2012 also indicate that the
> [plaintiff] was neurovascularly intact. The
> undersigned noted that the [plaintiff] alleged
> feelings of numbness in his hands, but examiners
> have not attributed this continued symptom to
> carpal tunnel syndrome.

Thus, the law judge provided thorough reasons for concluding that the

plaintiff did not require a greater limitation in manipulation than the

limitation imposed in the residual functional capacity determination.

The plaintiff also indicates that the law judge erred in not

discussing the medical records from Dr. Jaishree Manohar (Doc. 24, p. 17).

The lone sentence regarding the absence of a mention of Dr. Manohar does not satisfy the requirements of the Scheduling Order and Memorandum Requirements so that this contention is forfeited.

Moreover, the plaintiff makes no attempt to show that there was anything in the notes of the plaintiff's first two visits to Dr. Manohar, which is all that was before the law judge, that would support additional functional limitations, much less compel such a finding (see Doc. 24, p. 17). Dr. Manohar first saw the plaintiff on January 8, 2015, and again on January 27, 2015, which was after the plaintiff's insured status ended on December 31, 2014 (Tr. 1177-1184). Dr. Manohar assessed the plaintiff as having Sicca syndrome (otherwise known has Sjogren's syndrome) and unspecified inflammatory polyarthropathy (Tr. 1180). At the plaintiff's second visit, Dr. Manohar also assessed the plaintiff as having osteoarthritis and obesity (Tr. 1183). In the doctor's assessment and plan section of his notes, he does not indicate that the plaintiff has any functional limitations as a result of his conditions at that time. Therefore, the plaintiff's undeveloped reference to Dr. Manohar does not provide any basis for challenging the law judge's decision.

In sum, the law judge thoroughly explained her decision regarding the plaintiff's Sjogren's syndrome and the plaintiff's resulting limitations from it.  The plaintiff's brief arguments do not demonstrate that the law judge's decision was not based on substantial evidence.

F.      In his fifth argument, the plaintiff summarily contends that "the ALJ failed to recognize the plaintiff's tremors were verified by nerve conduction test" (Doc. 24, pp. 17-18).  The plaintiff, therefore, appears to contend that a nerve conduction test performed on February 21, 2014, supports that he has tremors and, therefore, the law judge erred in her decision in not considering the test (id., p. 18).  The Commissioner correctly counters that the law judge considered the nerve conduction test in her decision (Doc. 26, p. 13).

Thus, the law judge in her decision considered the test and stated (Tr. 24-25):[7]

> The [plaintiff's] allegations of tremors and numbness are largely unsupported by the evidence. The undersigned acknowledges that the [plaintiff]

---

[7]Dr. Guangbin Xia under the Impression portion of the test stated "[u]nremarkable study without electrophysiological evidence of peripheral neuropathy or myopathy" (Tr. 972).

presented with tremors mostly in his hands, but occasionally in his upper extremities, on several occasions. However, these do not appear to be as frequent or as severe as alleged. First, nerve conduction studies are within normal limits. (Exhs. 13F and 21F). Additionally, a number of records indicate that the [plaintiff] had no tremors and normal sensation. During November 2012, treatment records indicate that the [plaintiff] had only "intermittent" tremors. During a neuropsychological evaluation, Dr. Dotson, an Assistant Professor and Licensed Psychologist, noted that the [plaintiff's] hand tremors were inconsistent. (Exh. 20F). She indicated that these tremors would be dramatically present for one activity and absent for another. Dr. Shingala noted that the [plaintiff] had no tremors at all. The [plaintiff's] allergy physician-assistant, Ms. Oxendine, and the [plaintiff's] allergist, Dr. Lakhani, fail to make any notation indicating that the [plaintiff] suffered tremors despite reviewing the [plaintiff's] neurological system. (Exhs. 33F, and 35F). Additionally, Dr. Ritter, Parekh, and Dr. Shingala all noted that the [plaintiff] had full sensation, which tends to discredit the [plaintiff's] allegations of numbness.

A number of the [plaintiff's] examining and treating physicians indicate that the [plaintiff's] reported symptoms did not align with objective findings. For example, Dr. Trevasa noted 'I am not certain if his tremor is voluntary.' (Exh. 13F). Dr. Dotson reported that:

> Results are not in line with any known neurological
> condition.  His difficulties are unexplained by his
> current medications or any acute illness.  He may
> be experiencing difficulty with memory and other
> cognitive functions in everyday life, but the extent
> of his difficulties is not clear based on the current
> evaluation.

Clearly, the law judge reviewed the test in determining the plaintiff's residual functional limitations and thoroughly reviewed the record. Indeed, the law judge determined that the plaintiff's tremors were a severe impairment (Tr. 17). However, the law judge concluded that the tremors were not as severe as alleged.  Consequently, the plaintiff cannot rely on his discounted credibility to prove additional limitations.  Regardless, the plaintiff's conclusory and incorrect assertion that the law judge did not consider the nerve conduction study provides no basis to undermine the law judge's finding in this respect.

G.    In the plaintiff's final argument, he asserts that "new and material evidence submitted to the Appeals Council after the ALJ decision from Dr. Manohar and Dr. Fickey demonstrates the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record" (Doc. 24, pp. 18-20).  The plaintiff's argument is without merit.

-41-

Pursuant to Ingram v. Commissioner of Social Security Administration, 496 F.3d 1253 (11th Cir. 2007), when the Appeals Council considers new evidence and declines review, the district court should determine whether the Appeals Council has correctly decided that the law judge's findings are not contrary to the weight of all the evidence. See Tucker v. Astrue, 2008 WL 2811170 (M.D. Fla. 2008). Specifically, the applicable regulations provide, in reviewing decisions based on an application for benefits (20 C.F.R. 404.970(b) (2013)):

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.... It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.[8]

---

[8]It is noted that the regulations have been amended to state:

> The Appeals Council will review a case if ... the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is reasonable probability that the additional evidence would change the outcome of the decision. 20 C.F.R. 404.970(a).

However, at the time of the decision, the previous regulations controlled. Cf. Lara v. Commissioner of Social Security, 2017 WL 3098126 *8 n.5 (11th Cir.) (unpub. dec.).

Accordingly, the additional evidence is considered to determine whether, in violation of 20 C.F.R. 404.970(b), the Appeals Council erred in concluding that the law judge's findings were not contrary to the weight of the evidence currently of record.   However, before this determination is undertaken, there are also threshold inquiries whether the evidence relates to the date on or before the date of the law judge's decision and whether the evidence is new and material.

With respect to the submission of new evidence, the plaintiff, has to overcome four hurdles in order to prevail on an <u>Ingram</u> claim.  Thus, he must show (1) that the evidence relates to the period on or before the date of the law judge's decision, (2) that the evidence is new, (3) that the evidence is material, and (4) that the Appeals Council erred in deciding that the law judge's findings were not contrary to the weight of all the evidence.

Notably, the plaintiff makes no attempt to show that he met all of the elements necessary to establish that the Appeals Council erred in denying review following the submission of additional evidence.  In light of the Scheduling Order and Memorandum Requirements, this contention is forfeited (<u>see</u> Doc. 23, p. 2).  <u>Sanchez</u> v. <u>Commissioner of Social Security,</u>

supra. In any event, the additional evidence does not meet the necessary
elements for reversal of the law judge's decision.

### Dr. Manohar's Assessment

Dr. Manohar completed an "AutoImmune Disorder Medical
Assessment Form" on May 13, 2016 (Tr. 1202-05). Dr. Manohar indicated
that the plaintiff has Sjogren's syndrome and rheumatoid arthritis (Tr. 1202).
Dr. Manohar opined that the plaintiff has extreme physical limitations. For
example, the doctor circled on the form that the plaintiff would only be able
to continuously sit and stand at one time for zero to five minutes (Tr. 1204).
Dr. Manohar also indicated that the plaintiff can only walk less than one
block without rest or severe pain, and he marked that he can only sit or
stand/walk for less than two hours in an eight-hour work day (Tr. 1203,
1204). Dr. Manohar marked on the form that the plaintiff can rarely lift less
than ten pounds and never lift ten pounds or more (Tr. 1205). Dr. Manohar
also circled on the form that the plaintiff would have to use the restroom more
than ten times during a workday (Tr. 1204).

This contention is unavailing because, first, the plaintiff has
failed to show that the additional evidence relates to the period on or before

-44-

the date of the law judge's decision of April 14, 2015. Here, Dr. Manohar completed the form on May 13, 2016, well over a year past the law judge's decision. Further, while Dr. Manohar began treating the plaintiff on January 8, 2015, the doctor does not indicate on the form that the plaintiff had these extreme limitations as of April 14, 2015.

The plaintiff asserts that "the evidence is reasonably related to the issues adjudicated by the ALJ" (Doc. 24, p. 18). That is not the test. Rather, the plaintiff must show that the evidence "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. 404.970(b). The plaintiff has not even attempted to make such a showing. This is fatal to the plaintiff's claim.

Furthermore, while the evidence is new, it is not material. Evidence is material if there is a reasonable possibility that the new evidence would change the administrative result. Falge v. Apfel, 150 F.3d 1320, 1323 (11th Cir. 1998), cert. denied, 525 U.S. 1124 (1999). Here, the evidence would not change the administrative result.

Dr. Manohar's opinion was rendered more than one year after the expiration of the plaintiff's insured status on December 31, 2014. Dr.

Manohar did not opine that the limitations set forth in the May 13, 2016, form related back to the period on or before the end of the plaintiff's insured status. Absent such an opinion, the evidence from May 13, 2016, is not material.

<u>Dr. Melissa Fickey</u>

The plaintiff also argues that a "Mental Residual Functional Capacity Assessment" completed by Dr. Melissa Fickey ("Dr. Fickey") supports his claim of mental limitations contrary to the law judge's decision. This contention fails for the same reasons that the argument regarding Dr. Manohar failed.

Dr. Fickey completed the mental capacity assessment on June 28, 2016 (Tr. 1206-1209). Dr. Fickey marked on the form that the plaintiff has extreme limitations in the areas for understanding and memory, sustained concentration and persistence, and social interaction (Tr. 1207-1208). Dr. Fickey indicated that the plaintiff has extreme limitations in all areas of adaptation, except the doctor opined that the plaintiff has a marked limitation in being aware of "hazards and [to] take appropriate precautions" (Tr. 1209).[9]

---

[9]According to the form, an extreme limitation is defined as "[t]he ability to function in this area is precluded" (Tr. 1207). A marked limitation means "[t]he ability to function in this area is seriously limited" (<u>id.</u>).

Dr. Fickey reported that the plaintiff would be absent at least thirty days per month due to his mental impairment (id.).[10]

First, the plaintiff has failed to show that the additional evidence relates to the period on, or before the date, of the law judge's decision. Here, Dr. Fickey completed the form on June 28, 2016, well over a year past the law judge's decision dated April 14, 2015. The plaintiff has made no attempt to show that the June 28, 2016, opinion relates to the period on, or before, the law judge's decision on April 14, 2015.

Furthermore, the plaintiff cannot demonstrate that Dr. Fickey's opinion is material. Although Dr. Fickey began treating the plaintiff in October 2013, there is nothing on the form that indicates that the plaintiff had these extreme limitations prior to December 31, 2014 (Tr. 1206).

In sum, all of the plaintiff's arguments are unavailing.

---

[10]Dr. Fickey marked a notation before the number "30" and it is unclear whether she meant the plaintiff would miss work more than thirty days or only thirty days (Tr. 1209).

IV.

For these reasons, the decision of the Commissioner is supported by substantial evidence and does not contain reversible error. I, therefore, recommend that the decision be affirmed.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: JANUARY 5, 2018

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.